346 P.2d 1057

Val JONES, Plaintiff-Respondent,

v.

IDAHO LUMBER, INC., a corporation d/b/a Idaho Forest Products, Defendant-Appellant.

No. 8786.

Supreme Court of Idaho.

Nov. 19, 1959.

Rehearing Denied Dec. 7, 1959.

George L. Barnard, Idaho Falls, for appellant.

Furey & Furey, Salmon, for respondent.

462

TAYLOR, Justice.

Plaintiff (respondent) obtained a verdict and judgment against defendant for $4,000, for an alleged breach of a contract of employment. Defendant (appellant) is an Idaho corporation with its principal office and place of business at Idaho Falls. Defendant owns a sawmill and lumber processing business at Salmon, Idaho, which it operates under the trade name of Idaho Forest Products. At the time here involved the mill was under the control and management of Edward C. Waldal. A. B. Johnson was the president and general manager of the defendant corporation at Idaho Falls.

For a period of five years defendant's logging operations had been carried on under contract by John Jewett. Neither Waldal nor Jewett were officers or stockholders of defendant corporation.

The basic issue presented by this appeal is the question of the sufficiency of the evidence to support the verdict. We, therefore, summarize the evidence presented by the respective parties.

Johnson, called by plaintiff for cross-examination, testified that he was the president and general manager of the defendant, with headquarters at Idaho Falls; that he made all timber contracts; that Waldal was the manager of the mill at Salmon, but had no authority in the procuring or logging of timber; that the company bought some timber from the U. S. Forest Service in Custer county by contract dated June 5, 1956; that the logging of this timber was commenced the latter part of August, 1956, by Jewett, pursuant to a contract under which Jewett was paid on a per thousand board foot basis for logs delivered at the mill; that Jewett was "a contract logger" and not an employee, agent or servant of the defendant company; that the first falling of trees in the area was done by the plaintiff as an employee of Jewett; that plaintiff was not working for, and was not paid by the defendant.

Plaintiff's exhibit "B" is a complaint filed in a prior action brought by defendant against plaintiff. In that action an injunction was issued restraining Jones from interfering with the logging operations of defendant. In paragraph 4 of the complaint in the prior action it was alleged:

"That on or about the 1st day of August, 1956, the plaintiff, through its agents, servants and employees, entered upon said area and commenced the work of falling, cutting and removing such timber, but that during the month of October, 1956, the defendant interfered with such operations and with plaintiff's said agents, servants and employees, under the claim that he, the said defendant, had the sole and exclusive right to cut and fell all of said timber, by threatening to use violence and to cause great bodily harm to plaintiff's said agents, servants and employees if they continue to cut and fell any of said timber".

The complaint, exhibit "B", was sworn to by the witness Johnson.

Being asked to explain the discrepancy between his present testimony and the allegations of the former complaint, Mr. Johnson answered, "I don't understand as to whether a subcontractor is an employee, or an agent," and further testified that the words, "agents, servants and employees" in the former complaint referred to John Jewett and the people who were working with him; that the total timber available to defendant under its contract with the forest service would be just over 2,000,000 board feet.

On direct, Johnson testified that Waldal had no authority to employ, and had never employed, men to cut timber.

Plaintiff testified that he owned and lived on a cattle ranch adjoining the forest area where the timber purchased by defendant was located; that about the 1st of June, 1956, he informed Waldal he was thinking of bidding at the forthcoming sale by the forest service, but would not bid if Waldal's company would give him the logging contract in case the company became the successful bidder; also, that if the company became the successful bidder it would need logging roads through his ranch to facilitate the logging operation; that Mr. Waldal agreed that if plaintiff did not bid he would be allowed the logging contract, provided the company had sufficient logging for Jewett elsewhere; but if Jewett wanted to do the logging on the area involved he would be given the contract because he was the company's logger; however, if Jewett did take the logging contract, plaintiff "would definitely be allowed the falling end of the operation".

Plaintiff further testified that he did not submit a bid for the timber and that the defendant was the successful bidder; that

late in June he went with Waldal to see Jewett; that Jewett informed them he wanted the logging of the timber involved; that Waldal informed Jewett plaintiff had been promised the falling part of the operation; that "Jewett said that that would be okay", but was not agreeable to the price proposed; that about July 6th, "Mr. Waldal told me that it would be necessary for me to have my contract with Mr. Jewett, rather than signed by the Idaho Forest Products, due to the fact that Mr. Jewett would be the one that was doing the logging" ; that up to that time plaintiff had not seen Johnson and Johnson had not had anything to do with the negotiations with plaintiff; that about the middle of July, Waldal and Johnson came to plaintiff's home and there Johnson "told me that my felling contract would have to be with Mr. Jewett, because Mr. Jewett was the one that I would necessarily have to satisfy" ; about the 11th or 12th of August plaintiff talked to Jewett—Jewett objected to a price of $4.25 per thousand feet and asked plaintiff to do the falling for $4 per thousand; that he informed Jewett that Waldal had agreed to the $4.25 figure and he would not change the agreement in the absence of Waldal; thereafter Jewett brought Waldal to plaintiff's ranch and that Waldal explained that Jewett would furnish workmen's compensation for plaintiff and his employees, the cost of which would exceed the 25¢ difference between the price

first mentioned and the $4 proposed by Jewett; the price of $4 was agreed to; that later in August plaintiff went to Jewett's home to secure a written contract and Jewett "was extremely concerned as to whether in allowing a contract of that kind that I might fall the timber in a manner that would be very unsuitable to his skidding, or leave my stumps so high that it would interfere with his operation of his cats, and he was, in other words, very concerned as to whether I would fall that timber in a manner suitable to his skidding needs. So, that clause was put in our contract" ; that plaintiff commenced falling about the last of August; that about September 6th Jewett brought to the plaintiff a written contract for the falling, which was then executed by plaintiff and Jewett, and reads as follows:

"September 1, 1956

"Contract Agreement

"I, John Jewett, the party of the first part do hereby contract under the following provisions to Val Jones, the party of the second part, all of the falling of saw timber connected with the timber sale on Annie Roonie and Van Horn Creeks of Morgan Creek.

"I hereby agree to pay at the rate of four dollars ($4.00) per thousand BM log scale. I further agree to cover Val Jones and any help he may require with adequate Workmen's Compensation Insurance.

"This timber shall be cut according to Forest Service regulations and shall be felled according to my needs in regard to skidding.

"/s/ John Jewett

"John Jewett
"Salmon, Idaho

"/s/ Val Jones

"Val Jones"

(Plaintiff's exhibit "D")

Plaintiff further testified that he continued cutting through September and until late October, when he was stopped by the injunction procured by defendant; that he at all times had logs felled available for skidding and hauling, except one-half day when his saw broke down; that the forest service marked the trees to be felled; that neither the forest service nor Jewett ever complained about the manner of his falling; that he had cut close to 300,000 board feet; that Jewett became dissatisfied and asked plaintiff if he could not bypass a lot of marked trees, that they weren't saw logs and weren't making him any money and were not suitable for his operation; that plaintiff told him he could not do that; that Jewett informed him that he would have to have more fallers; that plaintiff replied that he had the falling contract and did not intend for others to come in and take over his operation;

Jewett informed plaintiff he would not skid or handle any more timber cut by plaintiff; that he received a letter from Jewett as follows:

"Challis, Idaho
"October 23, 1956

"Mr. Val Jones
"Challis, Idaho

"Dear Mr. Jones:

"This letter is to inform you that we withdraw from our contract with you dated September 1, 1956, upon the following grounds:

"You have not kept sufficient logs for my services as per the contract.

"Repeated attempts have been made to obtain your cooperation to fall more logs, but you have refused to increase the amount to fill my needs.

"/s/ John Jewett.";

that he had never refused to make more logs available for skidding; that Jewett paid him for the falling.

On cross-examination plaintiff testified that it was customary for the logging contractor to be paid "so much per thousand for logs delivered at the mill"; that no logging roads were built across his property.

The forest ranger, Cooperrider, testified that on October 23rd Johnson and Waldal came to the ranger's office in Challis and advised him they would be unable to per-

form their contract with the government unless they could get rid of Jones and asked if the ranger could help them; the ranger answered in the negative, but took them to the probate judge.

On cross-examination the ranger testified that sometime during September or October Jewett had complained that the falling was not proceeding far enough ahead of the skidding. The ranger explained that a "skidder doesn't like to skid where there is falling" and that Jewett complained "Jones was not far enough ahead of them so that they could put their skidders in there to get out the logs;" that in the beginning lack of roads hampered Jones; that all the roads had been completed before the freeze-up.

The probate judge testified that Johnson and Jewett came to his office with Cooperrider on October 23rd and asked him to write a letter for them; that Johnson told him what to put in the letter, which he typed and which Jewett signed (letter, supra); that though Jewett did some talking, most of the talking was done by Johnson.

Waldal testified, as a witness for the defense, that he was manager of the Idaho Forest Products sawmill at Salmon; that he took orders from Johnson and had nothing directly to do with the procuring of logs; Johnson made all arrangements for logs; that when Jones came to the mill and proposed that he would not bid at the forthcoming sale if he could have the logging contract, he advised Jones that he, Waldal, was not in a position to make a deal with anyone, that was not his job; that if the company was successful in buying the timber he "would put a good word in for him to Mr. Jewett, who done our logging"; that he told plaintiff all he could do would be to recommend him, that he did not hire fallers; that he took him to Jewett; that Jewett said he had his own fallers, but would make an exception "if it would do anybody any good"; that he, Waldal, did not tell Jones he could have the falling, but only that he would recommend him; and that he told Jones he would have to contract with Jewett; that Jewett was the logger for the company; that "John Jewett and I made a trip to the Jones ranch sometime before they started logging, and at that time we had decided—or John had decided to hire him to do the falling"; that an agreement was reached between Jewett and Jones at that time and was later written up; Jewett was to pay the withholding tax and insurance on Jones and his employees; and that Jones was never on the company payroll.

On cross-examination Waldal testified that Jewett left a letter (defendant's exhibit "One") at his office in the mill.

Mrs. Waldal testified that about July 1st Jones came to her home in the evening

and talked to Waldal in her presence and that Waldal told Jones that he, Waldal, did not hire loggers, "that we had a good logger, but if he wanted a job falling he would try to get him on with Mr. Jewett."

Jack Baker testified that in October he worked ten days as a faller for Jones; he heard trouble between Jones and Jewett; Jewett wanted more logs, Jones didn't agree, he thought he was making enough logs; that after Jones left the job the witness worked as a faller for Jewett, and that the fallers at that time could not keep ahead of the skidding.

John Jewett testified that he had been logging for the defendant for the past five years; that "logging" includes falling, skidding, loading and trucking to the mill; that he had a contract with Johnson to log the area "for so much a thousand, delivered to the mill"; that he went into the area to get out a million feet that year, "that was what the mill wanted"; that he went to see Jones about August 10th, at that time he told Jones he would pay the industrial accident insurance and give him $4 for the falling; that Jones agreed and that he then told him he could begin falling; that his cats would be in around the 1st of September.

Jewett further testified that he had no authority to hire anyone for the company and that he, personally, hired Jones under the contract dated September 1st; that he paid Jones every two weeks; that his work was satisfactory except that he would not fall enough timber; that he went into the area with three trucks "and the first week we was caught up to him, and from then on I was practically out of logs all the time. You can't fall timber and go right underneath that tree and pull it out; you got to have your fallers ahead of you"; that he asked Jones to get more help; that Jones said he could not afford to do so at the price he was getting; that Jones did not keep sufficiently ahead to meet either his skidding or trucking needs; that he had two cats on the job and "that equipment just stood there, there was nothing to skid"; that he had to continue to pay the operators to keep his crew; that in late October he told Jones he would have to have more logs or pull out; that he sent fallers in; that Jones threatened them; and that when Jones continued to fall timber, "I got a court order." The witness identified defendant's exhibit "One" as a letter, written for him by his wife, which he left in the mill office. The letter is as follows:

"Dear Ed:

"What ever you decide to do about giving up the timber sale is all right with me.

"But I can not operate any longer if Jones is not removed from the mountain.

He has threatened my fallers, that they will be hurt if they continue falling. He came up Sunday the 4th and fell trees in the strip of timber where they were working. Left them as they were fell not limbed and not bucked. Told the fallers he would be back Tuesday to fall more timber.

"Get him out or I'll get out.

"/s/ John Jewett."

That he had called Johnson by telephone and advised him that "it was either Mr. Jones or me"; and that Johnson went with him to the probate judge where notice of cancellation was prepared and that he signed it and sent it to Jones by registered mail; that Jones continued to fall timber and that later the court order was served and Jones quit; that he had paid Jones for all logs felled by him, except those felled after he had served notice of termination; that the company brought and maintained the injunction proceedings.

By its assignments of error defendant questions the sufficiency of the evidence in two particulars. First, it is contended that the evidence does not show that either Waldal or Jewett was authorized to act, or was acting, as agent of the defendant in the employment of plaintiff. Second, defendant contends that the evidence does not support the verdict because it shows plaintiff breached his contract of employment by failing and refusing to fall sufficient timber to meet the skidding needs of the logger, Jewett. Our review is limited to a determination as to whether there is substantial and competent evidence to support the verdict on these issues.

Although contrary conclusions might reasonably be drawn from the evidence, the following conclusions are supported by substantial evidence: Waldal, acting with apparent authority, carried on negotiations with plaintiff for the purpose of eliminating plaintiff as a competitive bidder at the forest service timber sale, and to procure for the company the possible use of logging roads over plaintiff's property, and also for the employment of plaintiff in the logging or falling of the timber. The negotiations had by Waldal were later concurred in by Johnson, whose authority in the premises is admitted. When the logging contractor became dissatisfied with plaintiff's performance, defendant by-passed its agent, Jewett, and took direct action to terminate plaintiff's employment, thus failing to recognize Jewett as an independent contractor.

In support of its first proposition defendant urges that the evidence conclusively shows Jewett was an independent contractor and that defendant is, therefore, not liable on the contract made by Jewett. In 1 Restatement of Agency, 2nd 12, mas-

ter, servant and independent contractor are defined as follows:

"(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent."

In Cloughley v. Orange Transportation Co., 80 Idaho 226, 327 P.2d 369, 370, syllabus 3, we held:

"It is the right to control and direct the activities of the employee, or the power to control the details of the work to be performed and to determine how it shall be done, and whether it shall stop or continue, that gives rise to the relationship of employer and em-

ployee, and the question of who pays the compensation is not controlling."

See also In re Pacific Nat. Life Assur. Co., 70 Idaho 98, 212 P.2d 397.

On the issue as to whether Jewett was an independent contractor the evidence is conflicting. He employed and paid his own workmen and covered them with compensation insurance; he furnished his own equipment; and he was paid on the basis of work performed. No evidence was offered by the defendant that it did not retain control, or the right to control, Jewett in the physical performance of the work to be done by him, or that it did not have the right to terminate his employment at any time. The evidence that the employment of plaintiff was not voluntary on the part of Jewett, but was done at the insistence of defendant, and that his employment was terminated by defendant, supports the conclusion that Jewett was not an independent contractor.

On the issue as to whether plaintiff breached his contract, thus justifying defendant in terminating his employment, there is competent and substantial evidence to support the conclusion that plaintiff substantially performed his contract up to the time his employment was terminated. The evidence is highly conflicting and preponderates on the side of de-

fendant's contention that plaintiff failed to fall the timber fast enough to meet Jewett's requirements. However, since there is substantial and competent evidence to the contrary, we must uphold the verdict. I.C. § 13–219; Nelson v. Inland Motor Freight Co., 60 Idaho 443, 92 P.2d 790; Kent v. F. S. Campbell Co., 80 Idaho 57, 324 P.2d 398.

Judgment affirmed.

Costs to respondent.

PORTER, C. J., and SMITH, KNUD-SON and McQUADE, JJ., concur.